IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KRISTIE BELL AND JOAN LUPPE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 2:12-cv-00929-TFM |
| | ) | |
| CHESWICK GENERATING STATION, | ) | Judge McVerry |
| GENON POWER MIDWEST, L.P., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**I.     Introduction and Summary.**

Defendant GenOn Power Midwest, LP ("GenOn") operates Cheswick Generating Station ("CGS" or the "Facility"), a 570-megawatt coal-fired electrical generating facility in the Borough of Springdale, Allegheny County.[1] This is unquestionably an activity that is essential to support modern life. Like all power plants, federal, state and local authorities extensively regulate CGS's operations. The United States Environmental Protection Agency ("EPA"), Pennsylvania Department of Environmental Protection ("DEP") and Allegheny County Health Department ("ACHD") comprehensively regulate the Facility's operations.

Despite this comprehensive oversight, Plaintiffs and their out-of-state counsel, through this common law tort suit, ask this Court to add its voice. Plaintiffs seek to turn this Court into an environmental regulator, exercising duplicative control over CGS's day-to-day operations. However, as the United States Supreme Court has recently made clear, the Clean Air Act's comprehensive regulatory framework leaves no room for private litigants, trial judges or juries to impose emissions standards or to set, alter or conflict with operational parameters that already are prescribed or permitted by highly specialized oversight agencies (agencies that have the expertise to find the delicate balance between cost, reliability and environmental effects).

---

[1] While Plaintiffs named "Cheswick Generating Station, GenOn Power Midwest, L.P." as the Defendant, there is no such entity. *See* Notice of Removal (Doc. 1-2), ¶ 11 & n.1; *see also* Pennsylvania Dep't of State Corporation System Search Results for "Cheswick" (Doc. 1-6).

For this reason, as the following discussion demonstrates, Plaintiffs' Complaint should be dismissed in its entirety. At a minimum, Plaintiffs' strict liability claim should be dismissed, because operating a power plant, as a matter of Pennsylvania law, is not an ultrahazardous activity for which strict liability may be imposed.

**II.     Background and Factual Allegations.**

    **A.     The Pervasive Regulation of Pennsylvania Power Plant Emissions.**

Before discussing Plaintiffs' factual allegations and common law claims, it is first appropriate to review the regulatory background against which this dispute arises, and which this suit threatens to disrupt – a regulatory background that will make clear that (while common law suits were once a permissible manner of challenging power plant emissions), the delegation of these matters to EPA and state agencies now precludes suits such as this.

        **1.     The Clean Air Act Entrusts the Regulation of Air Emissions in the First Instance to Federal and State Regulators.**

While the environmental consequences of industrial activity once were regulated exclusively using the common law, with judges applying principles of "reasonableness" to evaluate the lawfulness of a given emission, activity or process,[2] the Clean Air Act ("CAA") and Clean Water Act identified federal, state and local administrative agencies, and not the courts, as the bodies primarily responsible for defining environmental emission standards and policing compliance. The Supreme Court has described EPA's expansive role as follows:

> The Clean Air Act entrusts such complex balancing to EPA in the first instance, in combination with state regulators. . . . The expert agency is surely better equipped to do the job than individual district judges issuing ad hoc, case-by-case injunctions. Federal judges lack the scientific, economic, and technological resources an agency can utilize in coping with issues of this order. Judges may not commission scientific studies or convene groups of experts for advice, or issue rules under notice-and-comment procedures inviting input by any interested person, or seek the counsel of regulators in the States where the defendants are

---

[2] For example, federal judges once set sulfur dioxide emission levels at an industrial facility, *see Georgia v. Tennessee Copper Co.*, 237 U.S. 474, 474-78 (1915), and limits on ocean waste disposal, *see New Jersey v. City of New York*, 283 U.S. 473, 481-83 (1931).

located.  Rather, judges are confined by a record comprising the evidence the parties present.

*American Elec. Power v. Conn.*, 131 S. Ct. 2527, 2939-40 (2012) ("*AEP*") (citations omitted).

Given the nature of this "complex balancing," courts ultimately came to conclude that this regulatory system had displaced common law, as the regulatory framework governing industrial emissions evolved in the ensuing years.  For example, the Supreme Court held that the Clean Water Act's "comprehensive regulatory program," supervised by an "expert "administrative agency," displaced federal common law, reversing the position it had taken nine years before.  *Milwaukee v. Illinois*, 451 U.S. 304, 317-18 (1981) (abrogating *Illinois v. City of Milwaukee*, 406 U.S. 91 (1972).[3]

While it has taken longer, the Supreme Court has reached the same conclusion with regard to the regulation of power plant air emissions.  Earlier this year, the Court ruled that Congress had in fact fully occupied the field of air regulation when it delegated to EPA the authority to make decisions on what to regulate and how to do so.  *AEP,* 131 S. Ct. at 2538.  Moreover, the Supreme Court specifically held that EPA had in fact particularized its preemptive power over power plant air regulations.  *Id*.  In supporting its conclusion, the Court paid particular heed to the vast flexibility Congress gave EPA in the CAA.  For example, the CAA allows strict emissions criteria to give way to sector, state, regional and innovation-driven flexibility, permitting EPA to distinguish among classes, types, and sizes of stationary sources, 42 U.S.C. § 7411(b)(2), -(d), and to waive compliance with emission limits to permit a facility to test drive innovative technologies, 42 U.S.C. § 7411(j)(1)(A).  *See AEP,* 131 S. Ct. at 2538-39.

   **2.**  **Exercising Their Regulatory Authority, Administrative Agencies Comprehensively Regulate Power Plant Air Emissions.**

As a result of decades of federal and state rulemaking and permitting, regulation over power plant air emissions is comprehensive, including (but not limited to) the following:

---

[3] *Accord Middlesex C'ty Sewage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 21-22 (1981) (holding that the Clean Water Act fully occupied the field of ocean pollution).

**NAAQS Criteria Pollutants:** As the CAA directs, EPA has promulgated National Ambient Air Quality Standards ("NAAQS") for sulfur dioxide, particulate matter, ozone, nitrogen dioxide, carbon monoxide and lead. *See generally* 42 U.S.C. § 7409; 40 C.F.R. Part 50. If regional air quality does not meet EPA's NAAQS, the CAA directs states to prepare State Implementation Plans ("SIPs") to achieve the NAAQS, *see* 42 U.S.C. § 7410(a), which are submitted for EPA approval, *see id*. § 7410(a), -(k). Because Allegheny County air quality does not meet EPA's ozone and particulate matter standards, DEP has prepared a series of SIPs, *see generally* "Pennsylvania's Clean Air Plans," *available at* http://www.dep.state.pa.us/dep/ deputate/airwaste/aq/plans/clean_air_plans.htm. Further, ACHD maintains its own specified pollutant control initiatives, under DEP authority. *See* ACHD Rules & Regs., art. 21, *available at* http://www.achd.net/air/pubs/pdf/2012_Article21.pdf.

**Site-Specific Permitting Programs:** States issue operating permits for "major sources" under Title V of the Clean Air Act. *See* 42 U.S.C. § 7661a(d) (authority that has, in this instance, been delegated to ACHD). Pennsylvania's EPA-approved regulations are highly-detailed, themselves filling 150 pages of the Code of Federal Regulations. *See* 40 C.F.R. Part 52, Subpart NN. In similar fashion, the federal Prevention of Significant Deterioration program ("PSD") for areas attaining NAAQS requires that "a covered source must, among other things, install the 'best available control technology for each pollutant subject to regulation . . . .'" *Center for Responsible Reg. v. EPA*, No. 09-1322, 2012 U.S. App. LEXIS 12980, at *75 (D.C. Cir. June 16, 2012) (*quoting* 42 U.S.C. § 7475(a)(4)).

**Acid Rain Control:** EPA has implemented an acid rain cap-and-trade program that has successfully and cost-effectively reduced sulfur dioxide ("$SO_2$") emissions, allowing a power producer to install control technology or to purchase emission credits from others who have done more than their allocated share. *See generally* 40 C.F.R. Part 72. As a part of this regulatory regime, affected sources are required to monitor continuously their emissions of $SO_2$, nitrogen oxides ("$NO_x$"), and other related pollutants. *See generally* 40 C.F.R. Part 75.

4

**Hazardous Air Program and Utility NESHAP Rule:** The CAA requires EPA to regulate emissions of hazardous air pollutants ("HAPs") from defined industrial "source categories." *See generally* 42 U.S.C. § 7412. Regulated HAPs include the following substances, each of which Plaintiffs allege to be causing damage or injury: arsenic compounds; chromium compounds; hydrochloric acid; hydrogen fluoride; lead compounds; mercury compounds; and nickel compounds. *See id.* § 7412(b)(1). On February 15, 2012, EPA announced final national emission standards for hazardous air pollutants ("NESHAP") from coal-fired electric utility steam generating units, which requires facilities such as CGS to meet defined HAP standards, using "maximum achievable control technology." *See* 77 Fed. Reg. 9,304 (Feb. 16, 2012), *corrected by* 77 Fed. Reg. 23,399 (Apr. 19, 2012).[4]

**Cross-State Air Pollution Rule:** EPA has adopted a new, more stringent regulatory program, the Cross-State Air Pollution Rule ("CSAPR"), which seeks to reduce power plant $SO_2$ and $NO_x$ emissions in 28 states, including Pennsylvania, to ameliorate ozone and fine particle pollution in neighboring states. *See* 76 Fed. Reg. 48,208 (Aug. 8, 2011).[5]

**Greenhouse Gas Regulations:** EPA has also expanded its regulation of power plant "greenhouse gas" emissions. Beginning in 2010, EPA promulgated a series of rules governing, among other things, when stationary sources would become subject to Title V or PSD permitting for greenhouse gases. *See generally Center for Responsible Reg,* 2012 U.S. App. Lexis 12980, at *92.[6]

---

[4] On July 20, 2012, EPA announced that it was reconsidering certain aspects of the utility NESHAP. *See* "EPA to Review Technical Information on Mercury and Air Toxics Standards for New Power Plants," *available at* http://yosemite.epa.gov/opa/admpress.nsf/0/ a75e868b52c23f5d85257a41006c50b6?OpenDocument.

[5] The effectiveness of the CSAPR is stayed pending judicial review. *See EME Homer City Generation, L.P. v. EPA,* No. 11-1302, Order (D.C. Cir. Dec. 30, 2011).

[6] On March 27, 2012, EPA proposed a follow-on Carbon Pollution Standard for New Power Plants, which would set limits on carbon emissions from newly-constructed facilities. See EPA FACT SHEET: Proposed Carbon Pollution Standard for New Power Plants, *available at* http://epa.gov/carbonpollutionstandard/pdfs/20120327factsheet.pdf.

In sum, there can be no doubt but that air emissions from electrical generation facilities like CGS are carefully and extensively regulated.

### 3. This Comprehensive Regulatory Framework Governs Air Emissions from CGS, and Provides Many Avenues for Relief.

Pursuant to these many regulations, there is a comprehensive ACHD permit structure governing all aspects of air emissions from CGS.  For example, GenOn's Title V permit imposes emission limits on particulate matter, $SO_2$, $NO_x$, carbon monoxide, volatile organic chemicals, and ammonia from coal combustion.  *See generally* ACHD, Title V Operating Permit and Federally-Enforceable State Operating Permit, Exhibit A hereto, § V.A.[7]

Further, this permit imposes operational requirements that explicitly address the same matters at issue in this suit, providing, for example, that:

- GenOn may not "operate . . . any source in such manner that emissions of malodorous matter from such source are perceptible beyond the property line." *Id.* § IV.3.

- GenOn must "take all reasonable actions to prevent fugitive air contaminants from becoming airborne." *Id.* § IV.19.

- GenOn may not "conduct . . . any materials handling operation in such manner that emissions from such operation are visible at or beyond the property line." *Id.* § IV.4; *see also id.* §§ V.D.1.a, -E.1.a, -F.1.a (restricting visible fugitive emissions from coal handling and storage operations, ash handling, processing, and storage operations, and vehicular traffic).

- GenOn must ensure that "[a]ll air pollution control equipment" is "properly installed, maintained, and operated . . . ." *Id.* § IV.5.

- GenOn may not "operate any source . . . in such manner that emissions from such source . . . [m]ay reasonably be anticipated to endanger the public health, safety, or welfare." *Id.* § III.1(c).

ACHD's permit for installation of the Facility's state-of-the-art Flue Gas Desulfurization system also limits emissions of particulate matter, SO2, hydrogen chloride,

---

[7] In ruling on a Rule 12(b)(6) motion to dismiss, the Court may consider matters that are subject to judicial notice, *see, e.g., Winer Family Trust v. Queen,* 503 F.3d 319, 327 (3d Cir. 2007), including public records, *see Shelley v. Wilson,* 339 Fed. Appx. 136, 137 n.2 (3d Cir. 2009).

6

sulfuric acid mist, lead and hydrogen fluoride, and has similar narrative terms prohibiting malodor, fugitive emissions, or operations that may endanger public health, safety or welfare. *See generally* ACHD, Major Source/Major Installation Permit, Exhibit B hereto, §§ III.1(c), IV.3, IV.4, IV.5, IV.19, V.a.

Further, this regulatory system provides Plaintiffs with many avenues to obtain redress for their grievances. As the Supreme Court has noted, the CAA "provides multiple avenues for enforcement," permitting EPA "to inspect and monitor regulated sources, to impose administrative penalties for noncompliance, and to commence civil actions against polluters in federal court." *AEP,* 131 S. Ct. at 2538 (citing 42 U.S.C. §§ 7411(c)(2), -(d)(2), 7413, 7414). Importantly in this context, the CAA also allows "any person" to commence a lawsuit for civil penalties or injunctive relief "against any person . . . who is alleged to have violated . . . or to be in violation of . . . an emission standard or limitation" or permit condition. 42 U.S.C. § 7604(a).

Accordingly, the ACHD, DEP and ultimately EPA all have full jurisdiction over each every matter alleged in Plaintiffs' Complaint, and the CAA provides those agencies – and private citizens – with a full quiver of enforcement arrows.

**B.     Plaintiffs' Allegations.**

Despite the extensive regulations governing all aspects of the Facility's operation, and the variety of available enforcement mechanisms, Plaintiffs seek collateral relief in this common law tort suit. In particular, Plaintiffs' Complaint contends that GenOn's "operation, maintenance, control, and use of" CGS have damaged Plaintiffs, as a result of the "invasion by and inhalation of . . . odors, the deposit of . . . particulate coal dust, including fly ash, and particulates formed by gases and chemicals emitted by Defendant." ¶ 21.[8]

Plaintiffs' overarching complaint therefore arises out of GenOn's allegedly "improper operation of its facility." ¶ 22. The alleged source of these is CGS's stack, which allegedly sends "fly ash and unburned coal combustion byproducts . . . into the ambient atmosphere." ¶ 24. According to Plaintiffs, these "emissions from [GenOn's] coal fired

---

[8] Paragraph number references are to allegations in the Complaint (Doc. 1-2).

facility . . . combine with each other, or with the atmosphere, or atmospheric dust, or water particles, to form industrial particulate which will fall and has fallen onto Plaintiffs' properties thereby causing damage . . . ." ¶ 25.  As a result, Plaintiffs allege that their "person and property" have been "physically invaded by fallout, particulate, odor and air contaminants," ¶ 29, including substances that are allegedly "harmful," "noxious," "extra hazardous" and "known human carcinogens," ¶¶ 32, 35, that are "widely accepted and regulated as hazardous substances that create a high degree of risk of some harm, ¶ 68.  According to the Complaint, this causes not only property damage but also (*inter alia*) "nervous conditions and emotional sequelae," ¶ 56.

In addition to alleging generally-harmful conditions, Plaintiffs also claim injury from specific substances allegedly emitted by the Facility, asking the Court to rule on and regulate GenOn's alleged discharges of "barium compounds, copper compounds, dioxin and dioxin-like compounds, hydrochloric acid (acid aerosols), hydrogen fluoride, lead compounds, manganese compounds, mercury compounds, sulfuric acid (acid aerosols), vanadium compounds, and zinc compounds."  ¶ 23.  Elsewhere, Plaintiffs cite a longer list, including "arsenic compounds, barium compounds, chromium compounds, copper compounds, dioxin and dioxin-like compounds, hydrochloric acid, hydrogen fluoride, lead compounds, manganese compounds, mercury compounds, nickel compounds, polycyclic aromatic compounds, sulfuric acid, vanadium compounds, and zinc compounds." ¶31.  Plaintiffs further plead that GenOn "knowingly emits . . . sulfur dioxide into Plaintiffs' neighborhood . . . ." ¶43.

Plaintiffs allege that all of these emissions are "part of [CGS's] normal business operations" ¶ 33.  Plaintiffs also allege that they result from "the improper construction, and operation of the [F]acility," ¶ 37, purportedly "without proper or best available technology, or any proper air pollution control equipment," ¶ 38.[9]  Of course, all of these emissions – and the

---

[9] In fact, CGS employs state-of-the-art equipment for reducing air emissions, including low-$NO_x$ burners, electrostatic precipitators, selective catalytic reduction, and a flue gas desulfurization system.  *See generally* ACHD, Major Source/Major Installation Permit, Exhibit B hereto, § II.

Facility's related operations and emission controls – are regulated and controlled by the federal, state and local emissions programs described above, as memorialized in GenOn's permits..

**III.     Argument:  Plaintiffs Fail to State a Claim Upon Which Relief May Be Granted.**

   **A.     The Court Should Dismiss Plaintiffs' Claims Unless They Can Allege Facts Plausibly Showing an Entitlement to Relief**

In evaluating a Rule 12(b)(6) motion, this Court must determine if the Complaint alleges facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level," and to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 570 (2007).  This requires more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 570.  An "unadorned, the-defendant-unlawfully-harmed-me accusation," or "naked assertions devoid of further factual enhancement," will not suffice, and the alleged facts must "permit the court to infer more than the mere possibility of misconduct." *Ashcroft v. Iqbal,* 556 U.S. 662, 677-79 (2009) (all internals omitted).  Plaintiffs' Complaint fails to satisfy these standards.

   **B.     The CAA Preempts Plaintiffs' Common Law Claims.**

Plaintiffs' Complaint alleges common law claims that all have been preempted by the CAA, and that are under the exclusive regulatory control of the EPA and state and local agencies.  Preemption may occur in one of two ways.  First, "field preemption" precludes common law claims when Congress completely occupies a particular field of regulation and displaces state involvement.  *See generally AEP*, 131 S. Ct. at 2538.  Second, "conflict preemption" arises where state law would stand as an obstacle to accomplishing Congress's full purposes and objectives, that is, where state law would interfere with "the methods by which the federal statute was designed to reach this goal." *International Paper Co. v. Ouellette*, 479 U.S. 481, 493-94 (1987).  Both apply here.

### 1. The CAA Occupies the Field of Air Emission Regulation.

In *AEP*, the Supreme Court explicitly held that the CAA completely preempts any federal common law nuisance claims brought to redress power plant emissions. According to the Court, what matters is whether a **claim** is preempted by controlling federal acts, and not whether federal law permits the same remedies as a state law might: *i.e.,* "whether the field has been occupied, not whether it has been occupied in a particular manner." *AEP*, 131 S. Ct. at 2538 (internal quotation omitted); *accord Farina v. Nokia Inc.*, 625 F.3d 97, 133 (3d Cir. 2010). Here, although Plaintiffs may claim to seek remedies unavailable under the CAA, their claim actually seeks to regulate the nature of CGS emissions, judicial regulation of a permitted source that the CAA and *AEP* forbid.

While the Court in *AEP* expressly declined to decide whether the CAA preempts **state** common law claims, *see* 131 S. Ct. at 2540, the weight of subsequent authority has held as much. Most persuasive is the decision in *North Carolina ex rel. Cooper v. Tennessee Valley Authority*, 615 F.3d 291 (2011) ("*TVA*"). There, the district court issued an injunction, on North Carolina's state common law claims, that would require TVA to spend billions of dollars to improve its power plant facilities. The Fourth Circuit reversed, holding that the CAA preempted the common law claims on which North Carolina based its entitlement to relief, concluding that Congress, in enacting the CAA, "opted rather emphatically for the benefits of agency expertise in setting standards of emissions controls, especially in comparison with the judicially managed nuisance decrees for which [plaintiff] argues." *Id*. at 304.[10] The Fourth Circuit further stated that, because "Congress has chosen to grant states an extensive role in the [CAA's] regulatory regime through the SIP . . . and permitting process*,* field and conflict preemption principles caution at a minimum against . . . allowing state nuisance law to contradict joint federal-state rules so meticulously drafted. 615 F.3d at 303 (emphasis added).

---

[10] Somewhat more pointedly, the Court "doubt[ed] seriously that Congress thought that a judge holding a twelve-day bench trial could evaluate more than a mere fraction of the information that regulatory bodies can consider." *Id.* at 305.

Similarly, in *Comer v. Murphy Oil,* 839 F. Supp. 2d 849 (S. D. Miss. 2012)*,* the court considered whether a common law property damage suit asserting nuisance, trespass and strict liability claims could survive the CAA's preemptive impact. After noting that Congress had delegated air regulation to expert agencies, and that juries in common law tort cases would not be applying the law but rather "creating it," *id*. at 864, the court barred state common law actions. Such "state law causes of action . . . hinge on the determination that the defendants' emissions are unreasonable*,*" the court ruled, and are thus "displaced" by the CAA. *Id*. at 865.

This case is indistinguishable. There, plaintiffs alleged that "[d]efendants had a duty to conduct their business in such a way as to avoid unreasonably endangering . . . private property." *Id.* at 854. Here, Plaintiffs allege that GenOn, using "current technological processes and current engineering standards could and should preclude a discharge of any particulates and extra hazardous substances," ¶ 46,[11] a condition which they contend "unreasonably interfered with Plaintiffs' use and enjoyment of their property," ¶ 49. The fact that Plaintiffs' claims would require such a detour into judicial policymaking over the "reasonableness" of otherwise-regulated air emissions fatally dooms Plaintiffs' common law causes of action. *See Comer,* 839 F. Supp. 2d at 865.

Earlier this month, the Second Circuit concurred with this principle, declining to allow the use of CAA standards to set a duty of care in a common law negligence suit. *See Butnick v. General Motors Corp.,* No. 11-1068, 2012 U.S. App. LEXIS 14337 (2d Cir. July 11, 2012). There, the plaintiff sought damages from a diesel engine manufacturer for injuries allegedly resulting from the inhalation of engine fumes. *See Jackson v. Gen. Motors Corp,* 770 F. Supp. 2d 570, 574 (S.D.N.Y. 2011). The district court dismissed, ruling that was an impermissible effort by a common law plaintiff "attempting to enforce the CAA," that "is therefore subject to preemption," *id.* at 575. The Court of Appeals summarily affirmed.

---

[11] Of course, as noted above, GenOn already employs these technologies and practices. *See supra* at 9 n.9.

Here, CGS is subject to specific regulations, requiring specific controls, equipment, and processes. These standards arise in principal part out of federal law or regulation, as implemented and enforced by DEP and ACHD in partnership with EPA. Allowing Plaintiffs to engraft additional or different emission standards, under the guise of mandating "reasonable conduct," would undermine the CAA's comprehensive scheme, and make it impossible for regulators to strike their desired balance in implementing emissions standards.

        **2.    The Relief Plaintiffs Seek Would Conflict with Federal, State and Local Regulatory Decisions.**

As noted above, the CAA prescribes a comprehensive federal-state partnership for regulating power plant air emissions. While the CAA gives states a prominent role in this effort, the CAA is clear about the methods through which expert state and federal agencies create and implement air emissions policy. Congress has displaced federal common law, and other courts have preempted state common law on the same reasoning and with equal force. *See* e.g., *Butnick; TVA; Comer*.

Common law tort claims like Plaintiffs' would force judges and juries to decide specific cases, and implement localized emission criteria; this necessarily disrupts a regulatory framework that balances emission control against other considerations (e.g., the cost to be borne by consumers and the need to ensure the reliability of the power grid), that allows innovation, that gauges regional attainment, that sets specific emissions limits, and that uses specialized professional judgment to maximize the health and welfare of the citizenry. This has always worried the courts. In *Connecticut v. AEP*, the Second Circuit acknowledged the complex nature of questions like "How fast should emissions be reduced?; Should power plants or automobiles be required to reduce emissions?; Who should bear the cost of reduction?; and How are the impacts on jobs, security and the nation's economy to be balanced against the risk of future harms?" 582 F. 3d 309, 326 (2d Cir. 2009), *rev'd,* 131 S. Ct. 2527 (2012). In reversing, the Supreme Court emphatically rejected the notion that these were questions for federal courts and juries to address. *AEP*, 131 S. Ct. at 2539-40. This Court should follow suit.

### 3. No Saving Provisions Preserve Plaintiffs' State Common Law Claims from Preemption.

While the CAA contains general savings clauses, they do not apply here. Congress carefully limited those savings provisions to preserve state regulations and other laws enacted for the purpose of regulating emissions, not for preserving amorphous common law doctrines that would undermine comprehensive agency regulation and that would allow private citizens and courts to rewrite the substantive controls built elsewhere into the CAA.

For example, although 42 U.S.C. § 7416 provides that "nothing in this chapter shall preclude or deny the right of any State or political subdivision thereof to adopt or enforce (1) any standard or limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution . . . ," this provision merely allows state and municipal regulators the latitude to enact more stringent air pollution requirements than those required by the EPA, a freedom consistent with states' substantial role in air pollution prevention and control under the CAA, *see generally id.* § 7401(a)(3).

Nor does the savings clause in the CAA's citizen suit provision preserve Plaintiffs' claims. This provision provides that "[n]othing *in this section* shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of *any emission standard or limitation* or to seek any other relief (including relief against the Administrator or a State agency)." *Id.* § 7604(e) (emphasis added). As an initial matter, because Section 7604(e) by its terms is limited to matters that might otherwise be precluded by "this section" – Section 7604 – it merely holds that citizen suits are permissible under state law or common law, if otherwise applicable, even if a plaintiff has not complied with the prerequisites that would otherwise govern a CAA citizen suit in federal court (such as the requirement that the plaintiff provide pre-suit notice, or the limitation preventing citizen suits if EPA is diligently prosecuting an enforcement action, *see id.* § 7604(b)). Further, by preserving *only* those state and common law claims "seek[ing] enforcement of *any emission standard or limitation*," this savings provision by its terms is clear that it does *not* apply to preserve state

13

common law tort claims.  Because common law suits self-evidently do *not* seek to enforce defined emission standards or permit terms, Section 7604(e)'s savings provision does not apply.

Indeed, had Congress intended to exempt general common law claims from CAA preemption, it would have done so clearly.  *See, e.g., Geier v. American Honda Motor Company, Inc.*, 529 U.S. 861, 869 (2000) (construing 15 U.S.C. § 1397(k)'s statement that "[c]ompliance with a federal safety standard does not exempt any person from any liability under common law," to preserve common law claims).  As a result, cases considering the preemptive scope of the CAA, in the wake of *AEP,* have given no consideration or effect to these "savings clauses." *See generally TVA; Comer.*[12]

While some older decisions did discern a potential role for common law tort claims in connection with activities regulated under the CAA, these cases were decided before *AEP,* and made clear that CAA preemption occurred at the time that air regulation was delegated to EPA (and need not await EPA's full exercise of its regulatory power), and that preemption turns on whether a plaintiff's claims fall within the purview of EPA regulation, and not whether EPA can award the specific remedies that a plaintiff seeks.  *See* 131 S. Ct. at 2531.[13]

In short, "[a] federal statute's saving clause cannot in reason be construed as [allowing] a common law right, the continued existence of which would be absolutely

---

[12] The Supreme Court in *AEP* did not consider whether state common law was also preempted, along with federal common law, because the issue had not been "briefed by the parties." *See* 131 S. Ct. at 2531.  The Court left the issue for resolution on remand, but the *AEP* plaintiffs voluntarily dismissed their case, and the matter thus was never addressed.

[13] Further, even if these cases were not inconsistent with the intervening decision in *AEP,* they have peculiarities that render them inapplicable here.  For example, in *Her Majesty the Queen v. City of Detroit*, 874 F.2d 332 (6th Cir. 1989), the court remanded common law tort claims alleging facility pollution but relied heavily on a Michigan statute that uniquely allowed Michigan courts to make regulatory decisions.  *See id*. at 337-38.  Moreover, in *Gutierrez v. Mobil Oil Corp.,* 798 F. Supp. 1280 (W.D. Tex. 1992)*,* the court remanded nuisance and trespass claims against a petroleum refiner for nuisance and trespass, following *City of Detroit*.  However, the court expressly acknowledged that ensuing laws, regulations or higher court decisions could lead to a contrary result.  *Id*. at 1285.  *AEP* thus abrogates *Gutierrez*.  Further, the court held that compliance with applicable legal standards and regulations reasonably should preclude injunctive relief.  *Id*.

inconsistent with the provisions of the act." *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1748 (2011) (quotation omitted). Here, Plaintiffs seek to impose additional, different regulatory standards on the Facility, in a manner that is inconsistent with the comprehensive regulatory regime governing CGS's air emissions. The exercise Plaintiffs ask this Court to undertake – the development of pollution policy from scratch, guided only by vague notions of "reasonableness," and relying only on the evidence that happened to come before the Court – would run counter to the CAA's entrustment of pollution regulation to expert regulators, acting on a forward-looking industry-wide basis. As the Supreme Court explained in *AEP,* the CAA already "provides a means to seek limits on emissions" from domestic power plants and, in doing so, leaves "no room for a parallel track." 131 S. Ct. at 2538. Simply put, because the CAA cannot be held "to destroy itself," *Concepcion*, 131 S. Ct. at 1748, its savings clauses do not allow Plaintiffs to use common law tort principles to upend the comprehensive regulatory balance governing CGS.

### C. Plaintiffs Claims are Barred by the Political Question Doctrine

Relatedly, Plaintiffs' claims also raise pure questions of policy or governmental practice that would pit coordinate branches of government against each other, and which thus raise non-justiciable political questions. *See, e.g., Baker v. Carr*, 369 U.S. 186, 217 (1962). In this regard, the following factors counsel against judicial intervention:

> (1) a textually demonstrable constitutional commitment to a coordinate political department; or (2) a lack of judicially discoverable and manageable standards for resolving [the issue]; (3) the impossibility of deciding [the issue] without initial policy determination of a kind clearly for nonjudicial discretion; or (4) the impossibility of a court's undertaking independent resolution without expressing lack of respect for coordinate branches of government….

*Id*. In *Comer*, the court applied these standards, and determined that efforts to regulate power plant emissions through common law claims were not justiciable. The court cited the lack of "judicially discoverable and manageable standards for resolving the issues" and the requirement that the court and jury make "initial policy determinations" that Congress entrusted to the EPA and state agencies. *Id.* at 864-65. In *TVA*, the Fourth Circuit concluded the same, 615 F.3d at

304-05.  In short, courts reaching the question since *AEP* have all concluded that common law suits impacting power plant emissions would raise non-justiciable political questions, and this court should hold likewise.  EPA, DEP and the ACHD are fully equipped to manage CGS's emissions.  Any competing court action could only chill or interfere with the duties Congress delegated to these Executive Branch agencies, and not to the courts.[14]

### D. Plaintiffs' Strict Liability Claim Fails Because Power Generation Is Not an Ultrahazardous Activity.

Finally, the Court at least should dismiss Count IV, Plaintiffs' strict liability claim.  *See* ¶¶ 67-74.  Pennsylvania law imposes strict liability (outside the context of product liability) only for "ultrahazardous activity."  *See generally Haddon v. Lotito,* 399 Pa. 521, 523, 161 A.2d 160, 162 (1960); *Albig v. Municipal Auth. of Westmoreland C'ty,* 348 Pa. Super. 505, 512, 502 A.2d 658, 662 (1985).  No Pennsylvania court has ever applied this label to an activity with as much public importance, and as fully controlled by regulation, as the generation of electricity.[15]  This Court should not do so now.

Pennsylvania courts impose strict liability sparingly, and have been "hesitant" to apply this designation to activities "not traditionally within its scope."  *Villarix v. Terminix Int'l*, 677 F. Supp. 330, 335 (E.D. Pa. 1987).  Thus, courts have refused to designate as ultrahazardous activities such as (i) battery crushing and lead processing, *Reilly v. Gould, Inc*. 965 F. Supp. 588 (M.D. Pa 1997); (ii) gasoline storage, *Smith v. Weaver,* 445 Pa. Super. 461, 469-71, 665 A.2d 1215, 1219 (1995); *see also Hennigan v. Atlantic Ref. Co.,* 282 F. Supp. 667, 680-81 (E.D. Pa.

---

[14] In an analogous case, the Tenth Circuit recently declined to "afford[] a judicial remedy on top of one already promised by a coordinate branch" of government, because to do so would "risk[] needless inter-branch disputes over the execution of the remedial process and the duplicative expenditure of finite public resources."  The court also believed such duplication of effort also "risks . . . the entirely unwanted consequence of discouraging other branches from seeking to resolve disputes pending in court."  *Winzler v. Toyota Motor Sales, U.S.A., Inc.*, 631 F.3d 1208, 1211 (10th Cir. 2012).

[15] Whether an activity qualifies as "ultrahazardous" is a question of law for the Court to resolve.  *See Melso v. Sun Pipe Line Co.,* 394 Pa. Super. 578, 586-87, 576 A.2d 999, 1003 (1990); *Albig,* 348 Pa. Super. at 514, 502 A.2d at 663.

1967), *aff'd,* 400 F.2d 857 (3d Cir. 1968); (iii) the operation of an underground pipeline, *see Melso v. Sun Pipe Line Co.,* 394 Pa. Super. 578, 585-87, 576 A.2d 999, 1003 (1990); and (iv) pesticide storage or use, *see Villari v. Terminix,* 677 F. Supp. at 335; *Diffenderfer v. Staner,* 722 A.2d 1103, 1107-09 (Pa. Super. Ct. 1998).

The application of strict liability to public services such as power generation is particularly inappropriate.[16] The Superior Court has specifically held that "the provision and maintenance of electrical transmission lines and the transmission of high voltage electricity by electric companies do not constitute abnormally dangerous activities and reject the imposition of absolute liability against electric companies in this area." *Smithbower v. Southwest Cent. Rural Elec. Co-op., Inc.,* 374 Pa. Super. 46, 52, 542 A.2d 140, 143 (1988).[17]

There is no reason to depart from these precedents. Facilities for the generation of electricity from coal are both commonplace and crucial to the reliable and cost-effective supply of energy to the American people. Further, as discussed above, ACHD, DEP and EPA have full regulatory authority over CGS emissions, pursuant to their statutory duty "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population," 42 U.S.C. § 7401(b)(1). Activity expressly authorized by the legislature, and regulated by expert administrative agencies, cannot be determined ultrahazardous and Count IV thus should be dismissed.

---

[16] As the Superior Court observed in *Albig v. Municipal Authority,* an activity's value to the community is "a critical consideration" is determining whether an activity is abnormally dangerous. If an activity's value to the community is sufficiently high, strict liability would be inappropriate, and "'[i]n such instances, liability may be imposed only for failure to exercise a degree of care commensurate with the dangerous character of the activity.'" 348 Pa. Super. at 515, 502 A.2d at 663 (quoting RESTATEMENT (SECOND) OF TORTS § 520, comm. k).

[17] Courts across the nation are uniformly in accord. *See, e.g., Voelker v. Delmarva Power & Light Co.,* 727 F. Supp. 991 (D. Md. 1989); *Smith v. Home Light & Power Co.,* 734 P.2d 1051 (Colo. 1987); *Nelson by Tatum v. Commonwealth Edison Co.,* 465 N.E.2d 513 (Ill. App. 1984); *Fitzpatrick v. U.S. West, Inc.,* 518 N.W.2d 107 (Neb. 1994); *Wirth v. Mayrath Indus., Inc.,* 278 N.W.2d 789 (N.D. 1979); *Tauscher v. Puget Sound Power & Light Co.,* 635 P.2d 426 (Wash. 1981); *Estate of Thompson v. Jump River Elec. Co-op.,* 593 N.W.2d 901 (Wis. App. 1999).

## IV. Conclusion.

For the foregoing reasons, Defendant GenOn asks the Court to grant its motion, and dismiss Plaintiff's claims with prejudice, and enter judgment in GenOn's favor.

July 27, 2011
/s/ Paul K. Stockman_
Scott C. Oostdyk (Pa. I.D. No. 90839)
 soostdyk@mcguirewoods.com
MCGUIREWOODS LLP
901 East Cary Street
Richmond, Virginia 23219-4030
Telephone: 804-775-4373
Telecopier:  804-775-1061

Paul K. Stockman (Pa. I.D. No. 66951)
 pstockman@mcguirewoods.com
MCGUIREWOODS LLP
625 Liberty Avenue, 23rd Floor
Pittsburgh, Pennsylvania 15222
Telephone: 412-667-6000
Telecopier:  412-667-6050

*Counsel for Defendant GenOn Power Midwest, LP*

## CERTIFICATE OF SERVICE

I hereby certify that today I served a true and correct copy of the foregoing Memorandum in Support of Motion to Dismiss by making it available on the Court's electronic case filing system.

July 27, 2011
/s/ Paul K. Stockman_
Paul K. Stockman